WILLIAM TAYLOR, Respondent, *v.* THE COMMERCIAL BANK, Appellant.

1. BANKING — BANK CASHIER HAS NO AUTHORITY BY VIRTUE OF HIS OFFICE TO BIND THE BANK BY REPRESENTATIONS AS TO THE SOLVENCY OF CUSTOMERS. The cashier of a bank has no apparent or implied authority by virtue of his position to make any representations on behalf of the bank as to the solvency of a customer who is one of its debtors, and the bank will not, in the absence of evidence of authorization, be bound or estopped by such representations made by him in reply to an inquiry by one who has been referred to the bank by its customer for information upon the subject.

2. LIABILITY OF THE BANK, ASSUMING THAT THE REPRESENTATIONS WERE FRAUDULENT. A bank is not liable for the loss sustained by one who sold goods on credit to one of its customers upon the strength of the cashier's statement that the note proposed to be given in payment would be good and that he would get his pay, although the cashier knew at the time that the customer was largely indebted to the bank and was practically insolvent, where there is no evidence that the cashier had any authority to perform any duties other than those which inhered in his office as cashier and no evidence that any unusual method had been adopted by the bank for the transaction of its business which would include any authority upon the part of the cashier to bind the bank by representa-

tions as to the responsibility of its customers, especially in a case where the bank received nothing from the property of its customer, who thereafter became actually insolvent, and it derived no advantage by means of the sale to him.

3. SAME. Where the bank took no advantage of the transaction, the fact that although it did not, it might have profited by the wrongful and unauthorized act of its cashier, does not render it liable.

4. ACTION TO CHARGE THE BANK WITH RESULTANT LOSS — INSUFFICIENCY OF EVIDENCE TO AUTHORIZE RECOVERY. The evidence in an action against a bank to recover the damages alleged to have been sustained on account of the statements of its cashier, which were claimed to have been false and fraudulent, and by which the plaintiff was induced to sell goods on credit to one who was financially irresponsible, examined and held insufficient to establish that defendant's cashier was acting officially and within the scope of his authority when he made the representations relied upon to charge the defendant.

*Taylor* v. *Commercial Bank*, 68 App. Div. 458, reversed.

(Argued February 26, 1903; decided March 17, 1903.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 24, 1902, reversing a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term and granting a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Walter S. Hubbell* for appellant. The fraudulent representations alleged to have been made by the defendant's cashier were not the representations of the bank, nor can the bank be held liable by reason of such statements. (Kerr on Fraud & Mistake, 116; Story on Agency, § 115; Morse on Banks [3d ed.], 351, § 167; *Mapes* v. *S. Nat. Bank*, 80 Penn. St. 163; *Borwick* v. *E. J. S. Bank*, 2 Exch. 258; *Swift* v. *Jewsbury*, L. R. [9 Q. B.] 301.)

*Charles J. Bissell* for respondent. There was evidence sufficient to warrant a finding by the jury that the representations made to the plaintiff by the defendant's cashier, upon the faith of which the goods were sold and delivered to Light-

house, were made in the course of the cashier's employment, while acting within the scope of his authority and for the benefit of his principal. (*C. & A. Nat. Bank* v. *B. S. M. Co.,* 67 Mo. 39; *Mapes* v. *S. Nat. Bank,* 80 Penn. St. 163; *Richards* v. *Bank of Nova Scotia,* 26 Canada S. C. 381; *B. M. B. Co.* v. *C. F. R. Co.,* L. R. [18 Q. B. Div.] 714; *Surety Co.* v. *Pauly,* 72 Fed. Rep. 470; *Reed* v. *H. S. Bank,* 130 Mass. 443; *D. & R. G. R. Co.* v. *Harris,* 122 U. S. 597; *Salt Lake City* v. *Hollister,* 118 U. S. 256; *Nowack* v. *M. S. R. Co.,* 166 N. Y. 433; *Mulligan* v. *N. Y. & R. Ry. Co.,* 129 N. Y. 506.) There was evidence sufficient to warrant a finding by the jury that the defendant actually profited by the fraud of the cashier, who made the original fraudulent representations upon the faith of which the plaintiff parted with his property. (*N. Bank* v. *Smith,* 66 N. Y. 21.)

MARTIN, J. The defendant is a domestic corporation organized under the laws of this state, and the purpose of this action was to recover damages alleged to have been sustained by the plaintiff on account of false and fraudulent representations by which he was induced to sell goods on credit to one Lighthouse, who was financially irresponsible.

Upon the trial, at the close of the evidence, a motion for a nonsuit was made by the defendant upon the grounds that the representations made were not the representations of the bank; that the bank received nothing from the transaction; and, consequently, it was not liable for any representations made by its cashier. This motion was granted. The plaintiff appealed to the Appellate Division where, by a divided court, the judgment was reversed and a new trial granted.

The only question involved is whether there was evidence to justify the submission to the jury of the question of the defendant's liability. At the time of the alleged representations Lighthouse was engaged in the manufacture of mail bags under a contract with the United States government. He was and for several years had been a customer of the defendant, and was then its debtor to the amount of about

fifteen thousand dollars secured by notes made by him
and indorsed by John L. Acker. Lighthouse had been
recently burned out, and the jury would have been jus-
tified in finding that he was practically insolvent, although his
business had been very profitable, netting him annually
from six to ten thousand dollars. As appears from a state-
ment in the possession of the defendant's cashier, Acker
was the owner of real estate to the value of about $31,700,
which was incumbered for $17,450, leaving an equity of about
$14,250, and was an indorser upon the paper of Lighthouse
to the amount of about fifteen thousand dollars. All of these
facts were known to the cashier of the defendant. Light-
house applied to the plaintiff to purchase a quantity of mer-
chandise of the value of about five thousand dollars, in pay-
ment for which he proposed to give a note made by himself
and indorsed by Acker, and referred the plaintiff to the
defendant for information as to their responsibility. The
plaintiff subsequently called at the office of the defendant,
saw its cashier, stated that he had been referred to him to ascer-
tain the responsibility of Lighthouse and Acker, and the cashier
thereupon told him that the contract which Lighthouse had
with the government was all right, to take the note, it would
be good and he would get his pay. The plaintiff testified that
upon these representations he sold the merchandise and took
in payment therefor a note made by Lighthouse and indorsed
by Acker. There is no pretense that the statement as to the
contract which Lighthouse had with the government was
untrue, and the statement that he would get his pay was not a
statement of an existing fact, but at most of something in the
future, and, hence, not actionable. (*Lexow* v. *Julian*, 21
Hun, 577; affirmed, 86 N. Y. 638; *Gallagher* v. *Brunel*, 6
Cow. 347; *Farrington* v. *Bullard*, 40 Barb. 512, 516;
*Treacy* v. *Hecker*, 51 How. Pr. 69, 70; *Sawyer* v. *Prickett*,
19 Wall. 146, 163.) Therefore, the only ground upon which
a recovery could be had, even against the cashier, is that the
statement that the note would be good was material; that it
was made with a knowledge of its falsity and with intent that

it should be acted upon, and was not a mere expression of opinion. In other words, the plaintiff was bound to prove as to this statement, representation, falsity, scienter, deception and resultant injury to the plaintiff. (*Arthur* v. *Griswold*, 55 N. Y. 400; *Brackett* v. *Griswold*, 112 N. Y. 454.)

If we assume, which we do not decide, that the representations were sufficient to render the cashier personally liable, still the serious question in this case is whether the bank is liable for the statements made by its cashier. Obviously, when the representations were made, the cashier was not engaged in the transaction of the business of the bank. It is equally clear, as we shall see later, that it is no part of the duty of a bank cashier to make representations as to the responsibility of its customers or others. In this case Lighthouse referred the plaintiff to the bank to inquire as to his responsibility. The plaintiff called upon the cashier, made the inquiry, and was told by him the business in which Lighthouse was engaged; that he had a contract with the government which was all right and had been renewed; that the note would be good, and he would get his pay.

The duties of a cashier are strictly executive. He is properly the executive agent of the board of directors, as such to carry out what it devises as to the management of the business of the bank. There are certain functions which, by long and universal usage, have come to be recognized as belonging to the office of cashier. They are declared to be inherent in the office or position as a matter of law, and, unless restricted or enlarged, they, and they only, can be performed by him by virtue of his appointment. Under the circumstances of this case it is plain that it could not be properly held that the defendant's cashier was acting within the scope of his employment in making the representations complained of. (*Crawford* v. *B. S. M. Co.*, 67 Mo. App. 39; *Horrigan* v. *First Nat. Bk.*, 56 Tenn. [9 Baxter] 137; *First Nat. Bk.* v. *Marshall & Ilsley Bk.*, 83 Fed. Rep. 725; *American Surety Co.* v. *Pauly*, 170 U. S. 133; *First Nat. Bk.* v. *Ocean Nat. Bk.*, 60 N. Y. 278; *Mapes* v. *Second Nat. Bk.*, 80 Penn. St. 163.)

In the *Crawford* case it was held that a cashier has no apparent or implied authority by virtue of the position he holds to make any representation on behalf of the bank as to the solvency of one of its debtors, and, therefore, that the bank will not, in the absence of evidence of authorization, be bound or estopped by such representation made by him in reply to an inquiry on the subject.

In the *Horrigan* case it is held that answering questions as to the solvency of parties is no part of the business of a cashier of a bank, nor fairly included within the scope of such business, but may be, and probably is, an incident *of* such position, but not an incident *to* it, and in such a case no liability attaches to the bank.

In *First · Nat. Bank* v. *Marshall & Ilsley Bank* it was held that the cashier of a bank does not act as its agent or representative in answering an inquiry addressed to him by another bank as to the business standing of a third person ; and the bank is not bound or estopped by statements so made by him, his act being one not relating to the business of the bank, but simply one of customary courtesy, rendered without consideration, and that the failure of the officers of the bank, in answering a general inquiry from another bank as to the character and standing of a customer, to disclose the fact that the customer was indebted to their bank and that it held liens on certain of his property, will not estop it to assert such liens as against a mortgage subsequently taken by the inquiring bank.

In the *American Surety* case it was held that the making of a statement as to the honesty and fidelity of an employee of a bank for the benefit of the employee, and to enable the latter to obtain a bond insuring his fidelity, was no part of the ordinary business of a bank president.

In *First Nat. Bk.* v. *Ocean Nat. Bk.* it was held that in the absence of proof that special authority had been delegated by its board of directors, or had been exercised with their sanction or knowledge, or evidence that it had been the habit and practice of the corporation to receive property for

safekeeping, it was not responsible for property so received by its cashier.

In the *Mapes* case, a suit by the bank against indorsers of a note discounted for the accommodation of the drawer, where the affidavit of defense was that at and before the time that defendants indorsed the note they had inquired of the cashier and one of the directors of the bank whether it would be safe for them to indorse, and that these officers informed them that they considered the drawer perfectly good, and they would be safe in indorsing; that the officers knew the representations to be false, and that they made them to deceive the defendants, who would not have indorsed but for the representations, it was held to be insufficient, and that such declarations, although willfully false, made by the officers, not in the course of their duties as officers or agents of the bank, could not affect the bank.

Whether any particular act does or does not fall within the general power of a cashier, is said to be a question of law for the court and not of fact for the jury, although a question of fact may arise when it is claimed that the acts or conduct of the board of directors have amounted to a public holding-out of the cashier as its agent to perform other and unusual acts for the bank. (*Farmers & Mechanics' Bk.* v. *Troy City Bk.*, 1 Doug. [Mich.] 457; *Peninsular Bk.* v. *Hanmer*, 14 Mich. 208; *Merchants' Bk.* v. *State Bk.*, 10 Wall. 604; 1 Morse on Banks & Banking [4th ed.], § 153, note; Huffcut on Agency, 156.) It is true a bank may, by the adoption of a method of transacting its business which includes other than the ordinary powers vested in a cashier, confer upon him such additional powers as are necessary for the transaction of the business in the manner thus adopted.

There was no evidence in this case which would have justified a finding that the defendant's cashier had any authority to perform any duties other than those which inhered in the office. Nor was there any evidence whatsoever that any unusual method had been adopted by the bank for the transaction of its business, which would include any authority

upon the part of the cashier to bind the bank by representations as to the responsibility of its customers.

In September, 1894, more than a year after the representations are alleged to have been made, Lighthouse's business having proved unsuccessful by reason of the lack of orders from the government, he transferred his property and business to Thomas Swanton and John L. Acker under an arrangement by which the business was to be conducted by them in a manner specified. All deposits were to be made in the defendant bank, and the profits of the business and proceeds of the property were to be applied to pay the bank and the debt of the plaintiff, and, as testified to by the plaintiff's son, they were to share *pro rata*. When these obligations were discharged the business was to be restored to Lighthouse or to any person designated by him, after compensation to Swanton and Acker for the services rendered by them. Swanton was teller of the bank and Acker was indorser upon the notes held by the plaintiff and the bank. The business conducted by them was not successful. No profits were realized, chiefly because orders from the government ceased, and the business and property when ultimately disposed of realized nothing to apply upon the indebtedness of either the bank or of the plaintiff, so that the bank received nothing which rendered it liable for the means by which it was obtained or estopped it from denying the cashier's authority.

The respondent contends that the defendant was liable for the fraud of its cashier upon the principle that where a party receives and retains the fruits or product of a fraud it imposes a liability therefor, although such person may be innocent of personal participation in the wrong. It is an established principle of law that where a person acts for another who accepts the fruits of his efforts, the latter must be deemed to have adopted the methods employed, as he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the fraud by means of which they arose. (*Garner* v. *Mangam*, 93 N. Y. 642; *Krumm* v. *Beach*, 96 N. Y. 398; *Fairchild* v. *McMahon*, 139 N. Y. 290.) Obviously, that

principle has no application to the case at bar, as it is practically undisputed that the bank received nothing from the property of Lighthouse. Nor did it receive any advantage by reason of the sale to Lighthouse of the goods in question.

It is further urged that the liability of a principal for the unauthorized fraud of another includes a case where, although the principal did not profit, he might possibly have profited by the wrongful and unauthorized act. We have found no authority sustaining any such doctrine. A remark of Lord COLERIDGE in *Swift* v. *Jewsbury* (L. R. [9 Q. B.] 301, 312) seems to be relied upon. In that case the decision of *Barwick* v. *English Joint Stock Bk.* (L. R. [2 Exch.] 259) was under consideration, and it was there said : " I apprehend that there can be no doubt that a different set of principles altogether arises where an agent of a joint stock company in conducting the business of a joint stock company does something of which the joint stock company take advantage, and by which they profit, or by which they may profit, and it turns out that the act which is so done by their agent is a fraudulent one. Justice points out, and authority supports justice in maintaining, that where a corporation takes advantage of the fraud of their agent, they cannot afterwards repudiate the agency and say that the act which has been done by the agent is not an act for which they are liable." We find in this case and in the other cases relied upon by the respondent no decision or enunciated principle which supports his contention. But, on the contrary, we find that the cases cited merely sustain the conceded principle that one who receives and retains the fruits of fraud becomes liable therefor. The language of Lord COLERIDGE is to be considered in the light of the case he had under consideration, and the words " by which they profit, or by which they may profit," are to be interpreted in view of the questions involved and of their context. Obviously, they were employed upon the assumption that advantage had been taken of the transaction, induced by the fraud of the agent. In that case, the agent acted within the scope of his general authority in writing the letter which was the fraud

complained of.    Moreover, the words "by which they profit,
or by which they may profit," refer only to a condition where
the principal has actually taken advantage of the unauthor-
ized act of the agent.    If the principle contended for by the
plaintiff were broadly sustained, why would it not apply to
him as well as to the defendant, the arrangement having been
that the benefits of a continuance of the Lighthouse business
were to be shared *pro rata* by the plaintiff and defendant.
This suggestion illustrates the fallacy of the claim that a
party who might profit by a fraudulent transaction would be
liable therefor, although he neither adopted it nor took any
advantage under it.    Moreover the decision in the *Swift* case
rested entirely upon another ground which includes no prin-
ciple applicable to the case at bar.

It was said by the learned judge delivering the opinion of
the court below that the evidence was sufficient to support a
finding by the jury that when the cashier made such repre-
sentations he was acting for or on behalf of the bank and
made them for the purpose of enabling Lighthouse to obtain
the plaintiff's property, to the end that Lighthouse might
thereby continue in business and realize therefrom sufficient
to enable him to discharge his obligations to the bank, or some
part thereof.    We regard this claim at most as merely con-
jectural and, under the evidence, as too nebulous to form the
basis of a judicial determination.    If there is any competent
evidence in the record sufficient to have justified a jury in
finding that the cashier was acting for or on behalf of the
defendant in making such representations, or that they were
made for the purpose stated, we have been unable to discover
it.    While there was proof of declarations and admissions of
the defendant's cashier and teller as to past transactions and
as to matters not relating to any business of the bank and
which, consequently, did not bind it, there was no competent
proof of any facts which would have supported a finding of
the jury to that effect.    The admissions of an agent are not
competent evidence against his principal unless they are
expressly authorized or relate to and are made in connection

with some act done in the course of his agency so as to form a part of the *res gestæ.* (*Anderson* v. *Rome, W. & O. R. R. Co.*, 54 N. Y. 334; *Manhattan L. Ins. Co.* v. *F. S. S. & G. S. F. R. R. Co.*, 139 N. Y. 146.)

Nor can the admissions or declarations of an agent be evidence against his principal, either to establish the fact of his agency or the nature or extent of his authority. Neither can he create authority in himself to do a particular act by its performance or by asserting his authority to do it. (*Stringham* v. *St. Nicholas Ins. Co.*, 4 Abb. Ct. App. Dec. 315; *Hatch* v. *Squires*, 11 Mich. 185; *Howe Machine Co.* v. *Clark*, 15 Kansas, 492; *Brigham* v. *Peters*, 1 Gray [Mass.], 139; *Mitchum* v. *Dunlap*, 98 Mo. 418; *Butler* v. *C., B. & Q. R. R. Co.*, 87 Iowa, 206; Mechem on Agency, § 100.)

Even without eliminating from our consideration the incompetent testimony of the acts and declarations of the employees of the bank when not engaged in the transaction of the business of the latter, there is practically no evidence which would justify a jury in finding that the cashier was acting for or on behalf of the defendant in making the representations which are the subject of this action. It is true that when the cashier made such representations Lighthouse was indebted to the bank for more than fifteen thousand dollars, yet, as we have already seen, no duty was imposed upon the cashier, as such, to communicate to a person inquiring as to the responsibility of a customer, the actual situation of his account at the bank. Nor is it within the line of the duty of a cashier to disclose the condition of the account of the customers of a bank whenever inquiry is made as to their responsibility.

A careful study of the evidence discloses that there were no facts, circumstances or proof that would justify the conclusion that the defendant's cashier was in any way engaged in the business of the bank in making any of the representations proved, or that his purpose in making them was that attributed to him by the court below. It is possible that, under the evidence, the court may have suspected that such was the purpose, but a mere conjecture, suspicion or surmise is not sufficient to

authorize a finding to that effect. (*Laidlaw* v. *Sage*, 158 N. Y. 73, 94.)

It follows that the trial court properly nonsuited the plaintiff, and, hence, the judgment of the Appellate Division must be reversed and that of the trial court affirmed, with costs.

BARTLETT, J. (dissenting). As a minority of the court are unable to agree with the disposition to be made of this case, it is deemed proper to state, briefly, the position of the dissenting judges, as the rule of law about to be established is of far-reaching importance in the business world.

The precise question presented by this appeal has not been decided by this court, as stated by counsel on the argument. The great commercial interests of this state require a rule calculated to protect the public in their dealings with banks through their officers, and the decisions of courts in jurisdictions where the point now presented is of minor importance are not entitled to controlling weight.

The sole question is whether Pond, the cashier of the defendant, was acting officially and in the line of his authority, as representing the bank, when he made the representations to the plaintiff concerning the financial responsibility of Lighthouse and Acker.

There is no difference of opinion in the court concerning the following proposition: If A, being a depositor in a bank and desiring B to give him credit, sends him to the bank for information as to his financial responsibility, and the cashier represents A to be worthy of credit, the cashier must be deemed to have acted in his individual capacity, and his action would in no way bind the bank; that is to say, the relation of A to the bank, being solely that of depositor, would not justify the cashier in speaking officially.

It is for the reason that the facts in this case disclose a very different relation between the bank and the depositor that we are unable to agree with the majority of the court.

The controlling and undisputed facts are as follows: The representations of the cashier, which induced the plaintiff to

extend credit to Lighthouse, were made in April, 1893.   For some years prior to that date Lighthouse had been engaged in the business of manufacturing mail bags from leather and canvas under contract with the United States government. The plaintiff was a dealer in leather, and prior to 1893 had sold several bills to Lighthouse without making inquiry as to his financial standing, and they were regularly paid.   In the month of January, 1893, the factory of Lighthouse was partially destroyed by fire, ruining all his stock of leather and damaging his machinery and other plant to a considerable extent.   In the following April, when Lighthouse solicited plaintiff to sell him an invoice of leather, valued at about five thousand dollars, the latter asked for a reference as to his financial responsibility, and was directed to call upon the Commercial Bank of Rochester.   The plaintiff did so, and, relying upon the representations made by the bank's cashier, delivered the leather to Lighthouse.

Swanton, at the time of the trial the cashier of the defendant, and in April, 1893, its teller, testified as defendant's witness, under cross-examination, that in the years 1891 and 1892 Lighthouse was indebted to the bank in the sum of twenty-five thousand dollars; that shortly prior to January, 1893, the amount was twenty-two thousand dollars, and at the time of the representations made by Pond, the cashier, to the plaintiff, was between seventeen and eighteen thousand dollars.   It also appears that Lighthouse had no financial responsibility except such profits as he might realize in the performance of his contract with the government.

Acker, the surety on Lighthouse's contract with the government, and the indorser on plaintiff's note, testified that while he owned real estate, which, according to the statement made to the bank showed an equity of some fourteen thousand dollars, it was incumbered by mortgages, which were subsequently foreclosed by the bank and resulted in a judgment against him in every case for a deficiency.   The sequel proved that Acker was absolutely without financial responsibility.

13

Lighthouse, during all the transactions involved in this case, was a depositor of the defendant bank.

The plaintiff, when he made the sale based on the representations of the defendant's cashier, took Lighthouse's note for five thousand dollars, indorsed by Acker, dated May 4th, 1893, and falling due the following August, when it was protested and no part thereof paid except the sum of one thousand dollars. It is also to be borne in mind that Acker was an indorser on all of Lighthouse's paper in the hands of the bank.

In view of these facts, it would seem as if honesty and fair dealing required the bank, when called upon by the plaintiff at the instance of Lighthouse, to either refuse to make any statement in regard to the latter's financial responsibility or to disclose to the plaintiff the fact that it had been for a long time discounting Lighthouse's paper, with Acker as an indorser, held a large amount of it at the time when the question was asked, and that Lighthouse had been heavily indebted to the bank for several years.

It is said that, while this course of conduct might be required in fair dealing between two individuals, the rule would not apply if the reference as to the financial responsibility was made to a banking corporation.

We are unable to see any difference between the two cases. A bank, in our modern business life, comes into daily contact with the citizen in numberless ways, and, as an intangible legal entity can only act through its officers, there would seem to be no reason why it and the individual should not be held, under the circumstances disclosed in this case, to the same measure of good faith and business integrity.

It was greatly to the interest of the bank that the credit of Lighthouse should be maintained, and yet it seems very certain that if the plaintiff had been advised as to the true relations existing between the bank and Lighthouse and his indorser Acker, also of the business embarrassment under which Lighthouse was laboring, that no credit would have been extended to him.

The real situation existing at the time these representations were made is rendered apparent by the fact that the note for five thousand dollars, given in reliance upon the representations made in April, went to protest the following August.

In the view we take of this case, the facts, to which reference has been made, control the disposition of the question before the court, but it adds greater emphasis to them when the remaining facts, which need not be discussed in detail, show that the protest of plaintiff's note in August, 1893, was the beginning of the end and both maker and indorser thereof passed on into hopeless bankruptcy, their creditors losing, substantially, everything.

The prevailing opinion suggests doubt as to the sufficiency of the false representations as matter of law and assumes, but does not decide, that they would render the cashier liable.

It is a significant fact that appellant's counsel did not make this point.

We regard the representations, taken as a whole, as amply sufficient to charge the defendant.

At the close of all the evidence the learned trial judge granted defendant's motion for a nonsuit.

In writing this dissenting memorandum, we have spoken positively as to the effect of what we deem to be the controlling facts in this case, but the point really presented for our consideration is, was there sufficient evidence to submit to the jury the question whether these facts showed that the cashier was acting for the bank when he made the representations upon which the plaintiff relied? The learned Appellate Division was of the opinion that there were such facts and granted a new trial.

A very instructive case, having a direct bearing upon the situation here presented, is *Barwick* v. *English Joint Stock Bank* (L. R. [2 Exch.] 259). In that case the cashier of the bank delivered a written guaranty to the plaintiff to the effect that J. D.'s check on the bank in plaintiff's favor, in payment of goods supplied, should be paid on receipt of the government money, in priority to any other payment, *except*

*to the bank*, and made false statements as to the credit of J.
D. It appears that J. D. was indebted to the bank at the
time in the amount of twelve thousand pounds; that this fact
was not disclosed to the plaintiff, who, relying upon the repre-
sentations, extended credit to J. D. and accepted his check on
the bank, which the latter refused to honor, but applied the
government money upon the indebtedness due it from J. D.
The plaintiff sued the bank for fraudulent representations and
it was held liable.

In *Swift* v. *Jewsbury* (L. R. [9 Q. B.] 301) Chief Justice
COLERIDGE (at page 312) comments favorably upon the
*Barwick* case.

The case of *American National Bank of Denver* v. *Ham-
mond* (55 Pac. Rep. 1090) is also very much in point.

We are of opinion that the judgment of the Appellate
Division should be affirmed.

PARKER, Ch. J., CULLEN and WERNER, JJ., concur with
MARTIN, J.; O'BRIEN and VANN, JJ., concur with BARTLETT, J.

Judgment reversed, etc.